UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
                                                     :

VERONICA M. BONILLA MOJICA,
                                                     :

                 Plaintiff,                        **OPINION & ORDER**
                                                   :

              -against-                      18 Civ. 840 (GWG)
                                                     :

NANCY A. BERRYHILL, Acting Commissioner
of Social Security,                            :

                 Defendant.                     :
-------------------------------------------------------------x

**GABRIEL W. GORENSTEIN, United States Magistrate Judge**

Pro se plaintiff Veronica M. Bonilla Mojica brought this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final decision of the Acting Commissioner of Social Security (the "Commissioner") denying her claim for Supplemental Security Income under the Social Security Act (the "Act"). The Commissioner moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c).[1] Bonilla Mojica was given several opportunities to respond but did not file any opposition to the motion. For the reasons stated below, the Commissioner's motion is granted.

I. BACKGROUND

    A. Procedural History

Bonilla Mojica filed an application for Supplemental Security Income ("SSI") on October 22, 2014, alleging a disability onset date of June 28, 2013. See Certified Administrative Record, filed July 6, 2018 (Docket # 14) ("R."), at 151, 270-71. The Social Security Administration ("SSA") denied Bonilla Mojica's application on February 10, 2015. R. 154.

---

[1] See Notice of Motion, filed July 6, 2018 (Docket # 15); Memorandum of Law in Support of the Commissioner's Motion for Judgment on the Pleadings, filed July 6, 2018 (Docket # 16) ("Comm'r Mem.").

Bonilla Mojica then requested a hearing before an administrative law judge ("ALJ") to review the denial. R. 168. Bonilla Mojica appeared at a hearing before ALJ Anne Sharrard by video-conference on October 17, 2016, R. 81-97, but opted to postpone her hearing in order to attempt to obtain counsel, R. 91. A second hearing was held on February 3, 2017, again by video-conference, and proceeded although Bonilla Mojica had not obtained counsel. R. 98-137. In a written decision dated March 15, 2017, the ALJ found that Bonilla Mojica was not disabled. R. 30-51. Bonilla Mojica subsequently obtained representation from Bronx Legal Services, R. 23, and requested that the Appeals Council review the ALJ's decision, R. 22. Prior to the Appeals Council's review of the ALJ's decision, the SSA, on request by counsel, stated that it would not act for 25 days, and permitted Bonilla Mojica to submit any additional evidence that was "new, material, and [which] relate[d] to the period on or before the date of the hearing decision." R. 15-16, 21. Bonilla Mojica, through counsel, submitted additional evidence, but on December 12, 2017, the Appeals Council denied Bonilla Mojica's request for review of the ALJ's decision. R. 1-5. Bonilla Mojica then filed her complaint in this action.

The Court issued an order containing a briefing schedule. See Scheduling Order, filed Apr. 3, 2018 (Docket # 13). The Commissioner was ordered to file its motion for judgment on the pleadings by July 6, 2018. Bonilla Mojica was ordered to file her papers opposing the Commissioner's motion by September 6, 2018. Id. The Court reminded Bonilla Mojica of the September 6 deadline to file her opposition in August 2018. See Order, filed Aug. 17, 2018 (Docket # 18). That order also stated that if Bonilla Mojica needed additional time to file any opposition, "she can request it by writing to the Court." Id. On September 20, 2018, having not received any opposition or request for an extension from Bonilla Mojica, the Court sua sponte extended the deadline for her to file any opposition to October 11, 2018. See Order, filed Sept.

20, 2018 (Docket # 20). The order cautioned that if Bonilla Mojica failed to file her opposition by October 11, the "case may be dismissed for failure to prosecute under Rule 41 of the Federal Rules of Civil Procedure." Id. (emphasis omitted). On October 11, 2018, Bonilla Mojica filed a letter requesting an extension for her to file an opposition to December 11, 2018, see Letter from Veronica M. Bonilla Mojica, dated Oct. 11, 2018 (Docket # 21), which the Court granted on October 15, see Memo Endorsement, filed Oct. 15, 2018 (Docket # 22). In granting the extension, the Court stated that no further extensions would be granted. Id. Notwithstanding the order, Bonilla Mojica never filed any opposition.

On March 28, 2019, the Court directed the Commissioner to address certain arguments made by Bonilla Mojica's then-attorney to the Appeals Council regarding the inadequacy of the administrative record, and permitted Bonilla Mojica an opportunity to file a response. Order, filed Mar. 28, 2019 (Docket # 24). The Commissioner filed a letter as directed. Letter from Joseph A. Pantoja, filed Apr. 2, 2019 (Docket # 25) ("Apr. 2 Comm'r Letter"). Bonilla Mojica did not file a response.

B.  The Hearings Before the ALJ

1.  The October 2016 Hearing

The October 2016 hearing lasted roughly 20 minutes. ALJ Sharrard explained to Bonilla Mojica that the medical evidence in her case was "pretty old," and thus questioned Bonilla Mojica about the existence of any recent treatment. R. 83-86. In response to the ALJ's questioning, Bonilla Mojica explained that since January 2015, the date of the most recent records in the ALJ's possession, she had been seeing a Dr. Jackson at St. Barnabas Hospital and a therapist, Christina Toro. R. 86-87. She also said she had seen a pulmonary doctor in New York City for asthma. R. 87-88. The ALJ then explained to Bonilla Mojica the benefits of

postponing the hearing to obtain representation, and asked whether Bonilla Mojica wished to continue the hearing that day, or postpone to obtain representation. R. 88-90. Bonilla Mojica opted to postpone the hearing, R. 91, and the hearing was adjourned, R. 96.

### 2. The February 2017 Hearing

The same ALJ presided over the February 2017 hearing. Although Bonilla Mojica had not obtained representation, the hearing proceeded. R. 100-01. Also attending the hearing was an interpreter and a vocational expert ("VE"). R. 98.[2]

Bonilla Mojica first testified about her background. She stated that she was 35 years old, single, and lived with her children (16 and seven years old) and her mother in their first-floor Bronx apartment. R. 107-08. Bonilla Mojica testified that she made it to ninth grade, and tried to finish her GED but did not do so. R. 108. To support her household, Bonilla Mojica got "public assist[ance]," and one of her children received child support. R. 108. Bonilla Mojica does not have a driver's license and never learned how to drive because she never needed to. R. 115. Bonilla Mojica stated that she has trouble walking around in the city because the feels "paranoid," and finds herself "walking looking around," and becomes "frustrated when people talk to [her] in the wrong way." R. 115. To get to the hearing, Bonilla Mojica took a train. R. 114-15. Bonilla Mojica had not worked since October 22, 2014, the date on which she filed her SSI application. R. 109.

_____

[2] The ALJ stated that although the interpreter was present because Bonilla Mojica is bi-lingual, he would only be utilized "if she needs help," and otherwise the hearing would be conducted in English. R. 102. In her written decision, the ALJ found that Bonilla Mojica was able to communicate in English. R. 49. This decision was supported by substantial evidence in the record. See, e.g., R. 380 (FEGS assessment from October 2013 noting Bonilla Mojica speaks "some English"), 425-26 (FEGS assessment from October 2013 noting that Bonilla Mojica speaks English, and also that she "reports she speak[s] some English"), 691 (St. Barnabas Hospital intake form noting that Bonilla Mojica is "[b]ilingual").

Bonilla Mojica also testified about her work history. From 2002 to 2006, she worked full time as a cashier for several different employers, including McDonald's, Walmart, and Walgreens. R. 109-10. Her cashier job required her to stand most of the day, and while at Walgreens she would also have to lift and carry various items — at most around 20 pounds — to restock shelves. R. 111. In 2006, Bonilla Mojica took a day off from work at Walgreens to take her son, who was sick, to the hospital. Her son's father ended up taking the son instead, and so Bonilla Mojica went food shopping near the Walgreens, and was subsequently fired when one of her managers saw her shopping and assumed she was lying about her reason for not going to work that day. R. 112. Bonilla Mojica stated that she has not worked since 2006 because her son's father "was taking care of [her]," but that he died four months before the hearing. R. 113.

Bonilla Mojica testified about her mental health issues and treatment. She indicated that she had been seeking mental health treatment in New York since June 2013, and while she used to see psychiatrist Dr. Maria Mejia once every one to two months, she no longer does so. R. 117-18. Although she attended psychotherapy twice a month from January to April 2014 and once in August 2014, Bonilla Mojica stopped attending when she "went back with [her] son's father" because she "thought . . . everything [was] going to be fine." R. 120. She lived in Meriden, Connecticut with her son's father for around five months with her children, but eventually moved out in January 2016 and moved back to New York because she felt it was "not healthy" for her children. R. 120-21. She stopped going to see the son's father in May or June 2016, a few months before he died. R. 121. While in Connecticut, Bonilla Mojica had to testify in court multiple times with respect to domestic violence. R. 123.

After moving back to New York, Bonilla Mojica began going to St. Barnabas Hospital for mental health treatment in May 2016. R. 121-22. Bonilla Mojica was still taking the anti-

depression and anti-anxiety drugs Trazodone, Lexapro, and Buspar — the medications help "[c]alm [her] down a little bit sometimes," but for "sleeping they don't do . . . much because any kind of noise" wakes her up. R. 118. When prompted by the ALJ, Bonilla Mojica indicated that during the time she lived in Connecticut, she did not have access to medication, which made her depressed. R. 122. She stated that because of her depression, and inability to access medication, she was "trying to come back over" to New York to "keep doing [her] treatment." R. 122. Although she had problems with anger, Bonilla Mojica stated that she "could handle it" with medication, and that the medication helped "a lot." R. 123.

Bonilla Mojica testified about her daily activities. She dresses and grooms herself daily. R. 127. As for household chores, she said she does not "do much," because even grabbing a broom or a mop bucket is "painful" due to her lower back pain, for which she has never had any medical treatment. R. 124-25. She cooks for her children, helps them with school, and "basically" does "everything for them," especially the younger child. R. 125. Sometimes Bonilla Mojica's mother helps out with the children. R. 125. Bonilla Mojica helps her children get to school on time and usually picks the younger child up after school, although sometimes her mother or brother helps with that. R. 125-26. She helps her younger son with his homework. R. 127. Bonilla Mojica stated that she cannot always stay focused and sometimes cannot "remember things." R. 127. While she does not read books, magazines, or newspapers, she does watch television, and can focus on and understand, for instance, a news story on television. R. 128. She smokes a pack of cigarettes every day, but does not drink alcohol or use illegal drugs. R. 126-27.

Regarding social relations, Bonilla Mojica stated that she does not trust anyone, and indicated that she does not have friends or people that she interacts with aside from her family.

R. 127.  Around 2006, while working at Walgreens, Bonilla Mojica stated that she had no problem getting along with customers.  In fact, she testified to being "a happy person" who "like[d] to go out" and have friends.  R. 128.  That is in contrast to the present, when she does not like seeing people around her, and "feel[s] like suffocating when [she] see[s] people" around her.  R. 128.

As for her physical limitations, Bonilla Mojica testified that although she used to be able to lift around 10 to 15 pounds when working at Walgreens in 2006, she did not think she could do so anymore because of the "pressure" on her back.  R. 129.  For her back pain, Bonilla Mojica is sometimes given pain relievers Tramadol, ibuprofen, or Motrin.  R. 129.  She only takes these medications when she experiences "real strong pain."  R. 129.  The medication is limited in its effectiveness, because although it "calm[s] [the pain] down for the moment," the pain inevitably returns.  R. 130.  And although she has tried stretching and a heating pad for the pain, those methods also do not alleviate the pain.  R. 130.  Bonilla Mojica was prescribed Gabapentin in October 2014 — sometimes prescribed for nerve pain or mood — but she never went to pick up the prescription.  R. 131.

Finally, the ALJ heard testimony from the VE.  The ALJ asked the VE a series of hypothetical questions.  First, the ALJ asked the VE to

> assume an individual of the same age, education, and work experience as the claimant who has the following residual functional capacity.  This person could perform work at all exertional levels; can follow and carry out simple and routine instructions in a low-stress job, which is defined as having only occasional changes in the work setting and only occasional decision making required.  This person can have occasional brief and superficial interaction with supervisors, co-workers, and the general public, and the interaction with the general public cannot be face-to-face.  She can also . . . not participate in team-based activities.

R. 133-34.  The VE stated that such a hypothetical individual could not perform Bonilla Mojica's past relevant work of "cashier, checker."  R. 133-34.  The ALJ then asked the VE

whether the same hypothetical individual could perform jobs in the national economy.  The VE

replied that there were "examples of work within those parameters at the light level."  R. 134.

An example at the light level included "cleaner."  An example at the medium level included

"laundry worker," and an example at the sedentary level included "assembler."  R. 134.  The

ALJ posed another hypothetical to the VE:

> [I]f the individual from the first hypothetical could lift and carry 20 pounds
> occasionally and ten pounds frequently; sit six hours; . . . stand and/or walk six
> hours; never climb ladders, ropes, or scaffolds; occasionally climb ramps and
> stairs; stoop, crouch, kneel, crawl, and balance, could this hypothetical individual
> perform any of the jobs you just cited?

R. 134-35.  As to the second hypothetical individual, the VE stated that such a person could

work as a "cleaner" or "assembler," but not a "laundry worker."  R. 135.  The VE cited "mail

clerk" as another light job that the hypothetical individual could perform.  R. 135.  The ALJ

posed a third hypothetical to the VE: "[I]f I add that this person could not perform jobs at a

production rate pace, such as assembly line work but can perform goal-oriented work that can be

completed by the end of the work shift, would this alter your answers to any of the prior

hypotheticals?"  R. 135.  The VE responded that his answers would not be altered.  R. 135.

### C.  The Medical Evidence

The Commissioner has provided a summary of the medical evidence in the record.  See

Comm'r Mem. at 4-16.   The Court adopts the Commissioner's summary of the medical

evidence as accurate and complete for purposes of the issues raised in this suit.  We discuss the

medical evidence pertinent to the adjudication of this case in Section III below.

### D.  The ALJ's Decision

The ALJ denied Bonilla Mojica's SSI application on March 15, 2017.  R. 51.  Following

the five-step test set forth in SSA regulations, the ALJ found at step one that Bonilla Mojica had

not engaged in "substantial gainful activity" since October 22, 2014, the date her application was filed.  R. 32.  At step two, the ALJ found that Bonilla Mojica suffered from "severe impairments" of "mild lumbar degenerative disc disease, depressive disorder not otherwise specified ("NOS"), anxiety state unspecified, post-traumatic stress disorder ("PTSD"), and intermittent explosive disorder."  R. 32 (citing 20 C.F.R. § 416.920(c)).  The ALJ concluded that because "there was no explicit diagnosis of [attention-deficit/hyperactivity disorder, or] ADHD in the record, it is not a medically determinable impairment."  R. 32.  The ALJ also found that Bonilla Mojica had non-severe impairments of "headache, asthma NOS[,] and anemia NOS," as those impairments would "produce no more than minimal limitations upon the claimant's ability to perform work-related activities."  R. 33.

At step three, the ALJ found that Bonilla Mojica "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1" (the "Listings").  R. 33.  In reaching this conclusion, the ALJ gave particular attention to Listings 1.04 (disorders of the spine), 12.04 (depressive, bipolar and related disorders), 12.06 (anxiety and obsessive-compulsive disorders), 12.08 (personality and impulse-control disorders), and 12.15 (trauma- and stressor-related disorders).  R. 33-36.  As to mental impairments, the ALJ specifically considered whether the "paragraph B" criteria were satisfied, and found that they were not, as Bonilla Mojica's mental impairments did not "cause at least two 'marked' limitations or one 'extreme' limitation" as would be required under 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.01.  R. 33-36.  The ALJ also considered whether the "paragraph C" criteria were satisfied and determined that they were not.  R. 36.

Before moving to step four, the ALJ addressed Bonilla Mojica's residual functional

capacity ("RFC"). R. 36-49. The ALJ found that Bonilla Mojica had the RFC to perform "light work," under 20 C.F.R. § 416.967(b), "defined as lifting/carrying twenty pounds occasionally and ten pounds frequently," with the following restrictions:

> In an eight-hour day, she can sit six hours and stand and/or walk six hours. She can never climb ladders, ropes, or scaffolds. She can occasionally climb ramps and stairs, stoop, crouch, kneel, crawl, and balance. She can follow and carry out simple and routine instructions in a low stress job, which is defined as having only occasional changes in the work setting and only occasional decision making required. She cannot perform jobs at a production rate pace, such as assembly line work, but she can perform goal-oriented work that can be completed by the end of the work shift. She can have occasional brief and superficial interaction with supervisors, co-workers, and the general public but no face-to-face interaction with the general public and she cannot participate in team-based activities.

R. 36. In making his RFC determination, the ALJ stated that she "considered all symptoms and the extent to which the[] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 416.929 and SSR 96-4p." The ALJ also stated that she "considered opinion evidence in accordance with the requirements of 20 CFR 416.927 and SSRs 96-2p, 96-5p, 96-6p and 06-3p." R. 36. In determining Bonilla Mojica's RFC, the ALJ considered Bonilla Mojica's hearing testimony, R. 37-38, the objective medical evidence, R. 38-42, and accorded varying weights to Bonilla Mojica's allegations of mental impairments, R. 43, and to the medical opinions of the treating physicians and consultative examiners who either examined Bonilla Mojica and/or opined on her medical evidence in this matter, R. 44-49.

Having determined her RFC, the ALJ concluded that Bonilla Mojica would be unable to perform her past relevant work as a "cashier checker." R. 49. Then, at step five, the ALJ concluded — based on Bonilla Mojica's age, education, work experience, and RFC — that there were jobs that existed in significant numbers in the national economy that Bonilla Mojica could

perform, such as "cleaner" and "mail clerk."  R. 50.  Thus, the ALJ concluded Bonilla Mojica

"ha[d] not been under a disability, as defined in the Social Security Act, since October 22, 2014,

the date the application was filed."  R. 51 (citing 20 C.F.R. § 416.920(g)).  Accordingly, Bonilla

Mojica was found "not disabled" under section 1614(a)(3)(A) of the Social Security Act.  R. 51.

II.  GOVERNING STANDARDS OF LAW

   A.  Scope of Judicial Review Under 42 U.S.C. § 405(g)

A court reviewing a final decision by the Commissioner "is limited to determining

whether the [Commissioner's] conclusions were supported by substantial evidence in the record

and were based on a correct legal standard."  Selian v. Astrue, 708 F.3d 409, 417 (2d Cir. 2013)

(per curiam) (citations and internal quotation marks omitted); accord Greek v. Colvin, 802 F.3d

370, 374-75 (2d Cir. 2015) (per curiam); see generally 42 U.S.C. § 405(g) ("The findings of the

Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be

conclusive . . . .").  Substantial evidence is "'more than a mere scintilla.  It means such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Richardson

v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. N.L.R.B., 305 U.S. 197, 229

(1938)); accord Greek, 802 F.3d at 375; Burgess v. Astrue, 537 F.3d 117, 127-28 (2d Cir. 2008);

Matthews v. Leavitt, 452 F.3d 145, 152 n.9 (2d Cir. 2006); Shaw v. Chater, 221 F.3d 126, 131

(2d Cir. 2000).  The "threshold for such evidentiary sufficiency is not high."  Biestek v.

Berryhill, 139 S. Ct. 1148, 1154 (2019).

"Even where the administrative record may also adequately support contrary findings on

particular issues, the ALJ's factual findings must be given conclusive effect so long as they are

supported by substantial evidence."  Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (per

curiam) (citation and internal quotation marks omitted).  Thus, "[i]f the reviewing court finds

substantial evidence to support the Commissioner's final decision, that decision must be upheld, even if substantial evidence supporting the claimant's position also exists." Johnson v. Astrue, 563 F. Supp. 2d 444, 454 (S.D.N.Y. 2008) (citing Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990)). The Second Circuit has characterized the substantial evidence standard as "a very deferential standard of review—even more so than the 'clearly erroneous' standard." Brault v. Soc. Sec. Admin., Comm'r, 683 F.3d 443, 448 (2d Cir. 2012) (per curiam). "The substantial evidence standard means once an ALJ finds facts, [a court] can reject those facts only if a reasonable factfinder would have to conclude otherwise." Id. (emphasis in original) (citations and internal quotation marks omitted). "The role of the reviewing court is therefore quite limited and substantial deference is to be afforded the Commissioner's decision." Johnson, 563 F. Supp. 2d at 454 (citations and internal quotation marks omitted). Importantly, it is not a reviewing court's function "to determine de novo whether [a claimant] is disabled." Schaal v. Apfel, 134 F.3d 496, 501 (2d Cir. 1998) (citation and internal quotation marks omitted); accord Cage v. Comm'r of Soc. Sec., 692 F.3d 118, 122 (2d Cir. 2012).

B. Standard Governing Evaluation of Disability Claims by the Agency

The Social Security Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); see id. § 1382c(a)(3)(A). A person will be found to be disabled only if it is determined that his or her "impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To evaluate a Social Security claim, the Commissioner is required to examine: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam); accord Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999) (per curiam); Craig v. Comm'r of Soc. Sec., 218 F. Supp. 3d 249, 260 (S.D.N.Y. 2016).

Regulations issued pursuant to the Act set forth a five-step process that the Commissioner must use in evaluating a disability claim. See 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); see also Burgess, 537 F.3d at 120 (describing the five-step process). First, the Commissioner must determine whether the claimant is currently engaged in any "substantial gainful activity." 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). Second, if the claimant is not engaged in substantial gainful activity, the Commissioner must decide if the claimant has a "severe medically determinable physical or mental impairment," 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii), which is an impairment or combination of impairments that "significantly limits [the claimant's] physical or mental ability to do basic work activities," 20 C.F.R. §§ 404.1520(c), 416.920(c). Third, if the claimant's impairment is severe and is listed in 20 C.F.R. part 404, subpart P, appendix 1, or is equivalent to one of the listed impairments, the claimant must be found disabled regardless of his age, education, or work experience. See 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1520(d), 416.920(a)(4)(iii), 416.920(d). Fourth, if the claimant's impairment is not listed and is not equal to one of the listed impairments, the Commissioner must review the claimant's RFC to determine if the claimant is able to do work he or she has done in the past, i.e., "past relevant work." 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). If the claimant is able to do such work, he or she is not disabled. 20 C.F.R.

§§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  Finally, if the claimant is unable to perform past relevant work, the Commissioner must decide if the claimant's RFC, in addition to his or her age, education, and work experience, permits the claimant to do other work.  20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).  If the claimant cannot perform other work, he or she will be deemed disabled.  20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).  The claimant bears the burden of proof on all steps except the final one — that is, proving that there is other work the claimant can perform.  See Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009) (per curiam).

III.  DISCUSSION

Bonilla Mojica filed no opposition in this matter and thus has raised no specific challenge to the ALJ's decision.  A district court has the authority "under Fed. R. Civ. P. 41(b) to dismiss a complaint for failure to comply with a court order, treating the noncompliance as a failure to prosecute."  Simmons v. Abruzzo, 49 F.3d 83, 87 (2d Cir. 1995) (citing Link v. Wabash Railroad Co., 370 U.S. 626, 633 (1962), and Harding v. Federal Reserve Bank of New York, 707 F.2d 46, 50 (2d Cir. 1983)); see also Caussade v. United States, 293 F.R.D. 625, 629 (S.D.N.Y. 2013) ("Dismissal for lack of prosecution or for failure to comply with an order of the court is a matter committed to the discretion of the district court.") (citing Link, 370 U.S. at 633).  Cases appealing the SSA's denial of benefits under Section 405(g) of the Act are not exempt from this authority.  See, e.g., Bonnette v. Comm'r of Soc. Sec., 2018 WL 6173434 (E.D.N.Y. Nov. 26, 2018); Avila v. Comm'r of Soc. Sec., 2016 WL 1562944 (S.D.N.Y. Apr. 18, 2016); Hibbert v. Apfel, 2000 WL 977683 (S.D.N.Y. July 17, 2000).  And "while pro se litigants may in general deserve more lenient treatment than those represented by counsel, all litigants, including [those proceeding pro se], have an obligation to comply with court orders."  McDonald v. Head Criminal Court Supervisor Officer, 850 F.2d 121, 124 (2d Cir. 1988).  Given Bonilla Mojica's

failure to comply with a specific court order to respond to the Government's motion, dismissal for failure to prosecute is warranted in this case.

Nevertheless, we will "review[ ] the record to determine if the Government's motion for judgment on the pleadings is well founded." Estevez v. Apfel, 1998 WL 872410, at *1 n.1 (S.D.N.Y. Dec. 14, 1998). Specifically, we address whether the ALJ's decision is supported by substantial evidence as required by 42 U.S.C. § 405(g), and whether the ALJ fulfilled the Commissioner's duty to develop the record.

A.    Step Two Determination

We begin by reviewing whether the ALJ properly determined that Bonilla Mojica's impairments of headache, asthma NOS, and anemia NOS were not severe. See R. 32-33.

Under the Commissioner's regulations, an alleged impairment is "severe" only "if it significantly limits an individual's physical or mental abilities to do basic work activities." SSR 96-3p, 1996 WL 374181, at *1 (S.S.A. July 2, 1996); 20 C.F.R. § 404.1520(c). A "non-severe" impairment is one that is "a slight abnormality (or a combination of slight abnormalities) that has no more than a minimal effect on the ability to do basic work activities." SSR 96-3p, 1996 WL 374181, at *1.[3] "[T]he 'mere presence of a disease or impairment, or establishing that a person

_____

[3] "Basic work activities" are defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1522(b). Examples include

(1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;
(2) Capacities for seeing, hearing, and speaking;
(3) Understanding, carrying out, and remembering simple instructions;
(4) Use of judgment;
(5) Responding appropriately to supervision, co-workers and usual work situations; and
(6) Dealing with changes in a routine work setting.

Id.

has been diagnosed or treated for a disease or impairment' is not, by itself, sufficient to render a condition 'severe.'" Taylor v. Astrue, 32 F. Supp. 3d 253, 265 (N.D.N.Y. 2012) (quoting Coleman v. Shalala, 895 F. Supp. 50, 53 (S.D.N.Y. 1995)).  Although "[a] finding of 'not severe' should be made if the medical evidence establishes only a 'slight abnormality' which would have 'no more than a minimal effect on an individual's ability to work,'" Rosario v. Apfel, 1999 WL 294727, at *5 (E.D.N.Y. Mar. 19, 1999) (quoting Bowen v. Yuckert, 482 U.S. 137, 154 n.12 (1987)), the ALJ must take into account the cumulative effects of ailments, including those that are non-severe.  20 C.F.R. § 404.1545 ("We will consider all of your medically determinable impairments of which we are aware, including your medically determinable impairments that are not 'severe.'"); accord Dixon v. Shalala, 54 F.3d 1019, 1031 (2d Cir. 1995).

Here, the ALJ's conclusion that the limitations of headache, asthma NOS, and anemia NOS were non-severe is supported by the record.  To be sure, there is evidence that Bonilla Mojica had a diagnosis of headache, R. 592 (August 2014 progress notes), asthma NOS, e.g., R. 668 (January 2015 internal medicine examination), and anemia NOS, R. 589 (December 2014 assessment).  Beyond these diagnoses, however, there was virtually no evidence that these impairments caused more than an minimal effect on Bonilla Mojica's ability to perform basic work activities.  In August 2014, treating physician Dr. Ramon Tallaj's progress notes as to "Neurologic/Psychiatric" indicated "no fainting, no seizures, no weakness, no numbness, no tingling, no tremor, good coordination, good memory and speech."  R. 591.  Dr. Tallaj had noted the same in June 2014 (R. 595), September 2013 (R. 598), June 2013 (R. 601), and May 2013 (R. 604).  There are no other indications in the record of a diagnosis of or complaints of headaches.  As for asthma, in December 2014, Dr. Tallaj noted in his review of Bonilla Mojica's symptoms: "no wheezing, . . . no cough, . . . no respiratory infections, no bronchitis."  R. 590.

16

Consultative examiner Dr. Marilee Mescon noted in January 2015 that Bonilla Mojica had "never been hospitalized for asthma," had "never had an MRI for her asthma, and does not own a home nebulizer." R. 665. Dr. Mescon also stated that Bonilla Mojica had "no recollection of having used steroids for asthma." R. 665. And although St. Barnabas Hospital records from September 2016 indicate that Bonilla Mojica has a past history of asthma, those same records indicate that she was not taking any medication or receiving treatment for the asthma. R. 683-84.

As for Bonilla Mojica's diagnosis of anemia NOS, R. 589, there are no indications that the condition limited her ability to work in any way. As for ADHD, treating physician and psychiatrist Dr. Maria Mejia diagnosed "rule out" ADHD in December 2013, R. 484, as did treating physician Dr. Arthur Jackson in July 2013, R. 687-88. Accordingly, the ALJ's step two determination was supported by substantial evidence.

B. Step Three Determination

We next consider whether there is substantial evidence in the record supporting the ALJ's finding that none of Bonilla Mojica's impairments, taken individually or in combination with each other, meet or medically equal the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

Listing 1.04 requires evidence of a spinal disorder "resulting in compromise of a nerve root . . . or the spinal cord" with:

A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); or

B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by

17

severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours; or

C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in [§ 1.00(B)(2)(b)].

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04(A)-(C). In this case, there is no evidence in the record showing nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis. To the contrary, the record shows mostly normal spinal/lumbar function with minimal restrictions. For instance, a May 9, 2013, examination of the lumbar spine showed "minimal spurring along the endplates of L2 to L5," "no compression fracture," and "no spondylolisthesis." R. 588. In January 2015, Dr. Mescon noted that the "[c]ervical spine shows full flexion, extension, lateral flexion bilaterally, and full rotary movement bilaterally." R. 667. Dr. Mescon also noted "[n]o scoliosis, kyphosis, or abnormality in thoracic spine," and that the "[l]umbar spine shows full flexion, extension, lateral flexion bilaterally, and full rotary movement bilaterally." R. 667. That same report also stated: "No sensory deficit noted." R. 667. Although October 2013 to July 2014 progress notes from Dr. Mejia indicated back pain, R. 407, the notes also indicated no swelling, stiffness, limitations of movement, joint or muscle pain, leg pain or cramps, weakness, numbness, gait problems, or paralysis, R. 407-08. Dr. Mejia's notes also indicated intact range of motion for "upper/lower extremities, spine," with only "mild restriction." R. 413. The evidence also shows that Bonilla Mojica's ability to ambulate was not significantly impaired. See, e.g., R. 488 ("gait was steady and posture was normal"), 476-77 (claimant "ambulates at a normal pace with a steady gait and was able to sit and stand without difficulty"), 392 (no stated difficulty walking or climbing stairs), 309 (no ambulatory assistive device listed as required). Bonilla Mojica's hearing testimony indicates that she is able to walk without difficulty. R. 126

(explaining how she walks her son to school around the corner and picks him up as well). Accordingly, we find that there is substantial evidence to support the ALJ's conclusion that Listing 1.04 does not apply.

Listings 12.04, 12.06, 12.08, and 12.15 relate to depressive, bipolar and related disorders, anxiety and obsessive-compulsive disorders, personality and impulse-control disorders, and trauma- and stressor-related disorders respectively. In evaluating mental disorders, the "paragraph B" of each of the listings "represent the areas of mental functioning a person uses in a work setting." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(A)(2)(b). A claimant can satisfy the "paragraph B" criteria by showing "[e]xtreme limitation of one, or marked limitation of two," of the ability to:

1. Understand, remember, or apply information.

2. Interact with others.

3. Concentrate, persist, or maintain pace.

4. Adapt or manage oneself.

See id. §§ 12.04(B), 12.06(B), 12.08(B), 12.15(B) (citations omitted). "Marked" restrictions or difficulties are serious limitations on the ability to function "independently, appropriately, effectively, and on a sustained basis" in a given area, and represent a four on a five-point scale, with one being no limitation and five being "extreme limitation" — essentially no functioning at all in a given area. Id. § 12.00(F)(2). The "paragraph C" criteria are used "to evaluate mental disorders that are 'serious and persistent,'" recognizing that "mental health interventions may control the more obvious symptoms and signs of [a claimant's] mental disorder." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(G)(1). A mental disorder meets the paragraph C criteria if there is a medically documented history of the existence of the disorder over a period of

at least 2 years, and there is evidence of both:

1. Medical treatment, mental health therapy, psychosocial support(s) or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of [the claimant's] mental disorder; and

2. Marginal adjustment, that is . . . minimal capacity to adapt to changes in [the claimant's] environment or to demands that are not already part of [the claimant's] daily life.

See id. §§ 12.04(C), 12.06(C), 12.15(C) (citations and emphasis omitted). Based on a review of the record, we find that there was substantial evidence to support the ALJ's finding that listings 12.04, 12.06, 12.08, and 12.15 were not met.

First, with respect to the paragraph B criteria, the ALJ did not err in concluding that there were only mild limitations in Bonilla Mojica's ability to understand, remember, and apply information. Certainly, there was some evidence in the record of "below average" cognitive functioning. See, e.g., R. 672. But Bonilla Mojica also presented as alert and oriented at her examinations. R. 590 (December 2014), 592 (August 2014), 596 (June 2014), 645 (December 2013). Examinations indicated no issues with memory loss, R. 408, "good" memory, R. 591, or only "[m]ildly impaired" recent and remote memory skills, R. 672. Bonilla Mojica testified that she understands news stories on television. R. 128. She also helps her younger son with his homework. R. 127. There is other evidence in the record suggesting that any below average cognitive functioning would not be a serious limitation. Indeed, January 2015 examination notes from consultative examiner Dr. Fredelyn Damari indicated that Bonilla Mojica is "able to follow and understand simple directions and instructions and perform simple tasks independently," and that she is only "mildly impaired in the ability to maintain attention and concentration." R. 673.

As for interacting with others, concentrating, persisting, or maintaining pace, and adapting or managing oneself, there was substantial evidence indicating the existence of only

moderate limitations. As to interacting with others, although she has indicated that her anxiety prevents her from being in large crowds or taking buses or trains, R. 689, there is also ample evidence, including her own testimony, that Bonilla Mojica does use public transportation. R. 115, 306, 672. She also goes grocery shopping, R. 306, and enjoys spending time with her children, R. 691. In January 2015 notes, Dr. Damari reported that Bonilla Mojica had attended a school conference for her son. R. 672-73. And despite consistent notations that Bonilla Mojica exhibited anxious behavior at her appointments, see, e.g., R. 611 (report noting her consistently shaking legs), at various examinations, physicians reported Bonilla Mojica to be cooperative, R. 68, 394, 683, and calm, R. 394, 439, 611.

As to concentrating, persisting, or maintaining pace, while Bonilla Mojica reported issues with having "racing thoughts," R. 689, and difficulties concentrating, R. 671, she had no difficulties concentrating on television news stories, R. 128, indicating some ability to focus, and she was noted as being "alert and oriented" at multiple appointments and examinations, see, e.g., R. 576. Dr. Damari noted in January 2015 that Bonilla Mojica's thought process was "[c]oherent and goal directed with no evidence of hallucinations, delusions, or paranoia in the evaluation setting." R. 672. In the same report, Dr. Damari noted only mildly impaired attention, concentration, and recent and remote memory skills. R. 672; see also R. 673 (Dr. Damari's opinion that Bonilla Mojica is "able to make appropriate decisions"). And the ALJ noted in her written decision that Bonilla Mojica "participated in the hearing closely and fully without being distracted." R. 35.

Finally, as to adapting or managing oneself, while Bonilla Mojica indicated that the "cannot handle stress because it trigger[s] her mood swings, makes her irate," and leads to depression, R. 309, she testified that the anger is something she can handle and control with

medication, R. 123.  With respect to daily life, she indicated that she has the ability to pay bills

and manage finances, R. 306, dress and groom herself daily, R. 127, and use public

transportation, R. 306.  Medical evaluations indicated similar findings.  For instance, Dr. Mescon

stated in a January 2015 report that Bonilla Mojica "can do cleaning and laundry," "can shop,"

and "can shower, bathe, and dress."  R. 666.  There were no indications in the record that Bonilla

Mojica's impairments left her unable to manage herself on a daily basis or adapt to her

surroundings.  Accordingly, we find there is substantial evidence to support the ALJ's

conclusion that Listings 12.04, 12.06, 12.08, and 12.15 do not apply.

We do not find that the "paragraph C" criteria apply because there is no evidence in the

record that Bonilla Mojica has any "serious and persistent" mental disorders.

C.  RFC Determination

We next consider whether there is substantial evidence to support the ALJ's finding that

despite her physical and mental limitations, Bonilla Mojica "has the residual functional capacity

to perform light work" as defined in 20 C.F.R. § 404.1567(b).  R. 36.  Light work

> involves lifting no more than 20 pounds at a time with frequent lifting or carrying
> of objects weighing up to 10 pounds.  Even though the weight lifted may be very
> little, a job is in this category when it requires a good deal of walking or standing,
> or when it involves sitting most of the time with some pushing and pulling of arm
> or leg controls.  To be considered capable of performing a full or wide range of
> light work, [a claimant] must have the ability to do substantially all of these
> activities.  If someone can do light work, we determine that he or she can also do
> sedentary work, unless there are additional limiting factors such as loss of fine
> dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b); accord Heckler v. Campbell, 461 U.S. 458, 475 n.2 (1983); Giddings v.

Astrue, 333 F. App'x 649, 651 (2d Cir. 2009).

For similar reasons that we determined there to be substantial evidence to support the

ALJ's findings that Bonilla Mojica's impairments do not meet the listings as defined in 20

C.F.R. Part 404, Subpart P, Appendix 1, we also find that there is substantial evidence to support the ALJ's finding that Bonilla Mojica retains the RFC to perform light work with the limitations indicated by the ALJ.

      1.  <u>Physical RFC</u>

As to her degenerative disc disease and resulting lower back pain, the ALJ found that "[t]he type of treatment the claimant has sought tends to support a finding that she is not as disabled as she alleges." R. 43. The ALJ made this determination in large part on the basis of the objective medical evidence, and also because Bonilla Mojica "has not sought other conservative measures such as physical therapy, pain management, injections, or chiropractic care." R. 43. The ALJ limited Bonilla Mojica to light work with certain limitations "to account for her lumbar degenerative disc disease." R. 43. The record evidence supports the ALJ's conclusion.

Although Bonilla Mojica was diagnosed with degenerative disc disease, <u>e.g.</u>, R. 599, and back pain, <u>e.g.</u>, 668, objective medical evidence indicates minimal abnormal findings. As previously noted, a May 9, 2013, examination of the lumbar spine showed degenerative disc disease with "minimal spurring along the endplates of L2 to L5," "no compression fracture," and "no spondylolisthesis." R. 588. In January 2015, Dr. Mescon noted that the "[c]ervical spine shows full flexion, extension, lateral flexion bilaterally, and full rotary movement bilaterally." R. 667. Dr. Mescon also noted "[n]o scoliosis, kyphosis, or abnormality in thoracic spine," and that the "[l]umbar spine shows full flexion, extension, lateral flexion bilaterally, and full rotary movement bilaterally." R. 667. That same report also stated: "No sensory deficit noted." R. 667. Moreover, October 2013 to July 2014 progress notes from Dr. Mejia indicated no swelling, stiffness, limitations of movement, joint or muscle pain, leg pain or cramps, weakness,

numbness, gait problems, or paralysis. R. 407-08. Dr. Mejia's notes also indicated intact range of motion for "upper/lower extremities, spine," with only "mild restriction." R. 413. Bonilla Mojica's ability to walk does not appear to have been significantly impaired. See, e.g., R. 488 ("gait was steady and posture was normal"), 476-77 (claimant "ambulates at a normal pace with a steady gait and was able to sit and stand without difficulty"), 392 (no stated difficulty walking or climbing stairs), 309 (no ambulatory assistive device listed as required).

Opinion evidence supports the ALJ's finding as well. To start, after a Federation Employment & Guidance Services ("FEGS") assessment in October 2013, physician Dr. Deepak Sawlani noted moderate back pain, and that Bonilla Mojica could lift, push, and pull at most 10 pounds one to 10 times per hour. R. 414-15. Dr. Sawlani also opined that Bonilla Mojica could stand for one to three hours at a time, and walk for one to three hours at a time. R. 414-15. Dr. Sawlani also noted some restrictions with squatting, bending, and crouching/stooping. R. 415; see also R. 479-81 (same reports, signed by family practitioner Dr. Sheryl Pringle), 538-42 (same, by family practitioner Dr. Carole Marks). However, the ALJ could properly decide to give Dr. Sawlani's opinions (and the opinions of Drs. Pringle and Marks) little weight. See R. 45. As the ALJ explained, these opinions were not supported by Bonilla Mojica's medical and treatment history. Dr. Sawlani's own assessment in October 2013 indicated no lack of strength and intact range of motion in the upper/lower extremities and spine, and only "mild restriction" in overall range of motion. R. 413. Additionally, the ALJ noted that "Dr. Sawlani is a one-time examiner and it is unclear if Dr. Pringle or Dr. Marks even examined the claimant." R. 45. Dr. Mescon, a physician who had an opportunity to examine Bonilla Mojica, found that Bonilla Mojica had a normal gait, could walk on heels and toes without difficulty, and used no assistive devices, R. 666, and opined that based on an examination, "there are no limitations in

24

the claimant's ability to sit, stand, climb, push, pull, or carry heavy objects at this time," R. 668. The ALJ could properly accord more weight to Dr. Mescon's opinion. See Mongeur, 722 F.2d at 1039 ("It is an accepted principle that the opinion of a treating physician is not binding if it is contradicted by substantial evidence . . . and the report of a consultative physician may constitute such evidence."); accord Petrie v. Astrue, 412 F. App'x 401, 405 (2d Cir. 2011) ("The report of a consultative physician may constitute . . . substantial evidence."); Cruz v. Astrue, 941 F. Supp. 2d 483, 497 (S.D.N.Y. 2013). Finally, Bonilla Mojica's own testimony supports the conclusion that her back impairment was not as restrictive as she claimed. For instance, she testified at her hearing that she usually cooks for her children, and "basically" does "everything for them," especially the younger child. R. 125. She also helps her children get to school on time, usually walking to pick the younger child up after school, although sometimes her mother or brother helps with that. R. 125-26. She has also indicated that she sometimes goes shopping. R. 306, 666. This testimony, along with the medical records supplied by both Bonilla Mojica's physicians, provide substantial evidence to support the ALJ's conclusion that, despite Bonilla Mojica's physical impairment, she retains the RFC to do light work with some limitations.[4]

## 2. Mental RFC

As to Bonilla Mojica's mental impairments, the ALJ, in her RFC determination, "limited her to simple and routine tasks in a low stress job with only occasional changes in the work

_____

[4] As to physical limitations, there are additional allegations of knee pain, e.g., R. 590, and evidence that Bonilla Mojica was diagnosed with a "small joint effusion" in her right knee, R. 585, and right knee crepitus, R. 599. However, there is no evidence in the record indicating that the knee pain or the diagnoses affected Bonilla Mojica's ability to walk, or perform light work. Full range of motion in her knees was found in January 2015, and it was noted that no assistive devices were needed. R. 666-67. There was no indication of restrictions on lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, or stair climbing due to knee pain on Bonilla Mojica's Third Party Assessment Report, and on the same report, it was noted: "Claimant is able to walk." R. 308.

setting, only occasional decision making required, and no production-pace work, such as assembly line work, to account for her symptoms of anxiety, depression, PTSD, and occasional hallucinations." R. 43. The ALJ "also limited her to occasional brief and superficial interaction with supervisors, co-workers and the general public but no face to face interaction with the general public and no team-based activities to account for her reports of problems interacting with others including irritability, anger, and avoidance." R. 43. The ALJ found that "[t]he medical evidence does not support any further limitations." R. 43.

The ALJ's conclusion is supported by substantial evidence, including the medical records from treating physician Dr. Jackson and Bonilla Mojica's social workers. A January 2015 treatment summary signed by Dr. Jackson and social workers Eva Febus and Christina Toro indicated that Bonilla Mojica was "verbal, cooperative and stable on medication." R. 56. In a February 2015 follow up report, Dr. Jackson and social workers Febus and Toro noted that although Bonilla Mojica was still struggling with anger and irritability, she remained "goal directed," and there was "no thought disorder." R. 59. Later, in May 2015, Dr. Jackson and social workers Febus and Toro commented that Bonilla Mojica had "been compliant with treatment and has engaged with [a] therapist," that she had "been stable on medication," and that Bonilla Mojica had shared that "listening to music helps calm her down." R. 60. In July 2015, Dr. Jackson and the social workers noted that Bonilla Mojica had indicated she had been "feeling better." R. 64.

Treating physician Dr. Mejia's notes also support the ALJ's conclusion. In May 2014, Dr. Mejia noted that Bonilla Mojica was engaging in therapy once a week, was on medication prescribed by the therapist, and was "cooperative, alert and oriented," despite her depressed and anxious mood. R. 576. After a November 2014 medication management visit, Dr. Mejia noted

"[n]o delusions elicited, no paranoia, no suicidal ideation, no homicidal ideation," and no "auditory" or "visual hallucinations." R. 611; see R. 73 (Dr. Mejia's notation from November 2014 that Bonilla Mojica "[d]enies [ ]hearing voices at this time"). Dr. Mejia also noted "fair" impulse control, judgment, and insight. R. 611. Although in April 2014, Dr. Mejia checked off a box indicating that Bonilla Mojica was "temporarily unemployable," the ALJ gave this opinion "no weight," because "a statement from a medical source that a person is disabled or unable to work is not binding on me. The final responsibility for deciding the ability to work is reserved to the Commissioner." R. 46. The ALJ did not err as to this evaluation. See Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999) ("[S]ome kinds of findings — including the ultimate finding of whether a claimant is disabled and cannot work — are 'reserved to the Commissioner.'") (quoting 20 C.F.R. § 404.1527(e)(1)).

Opinion evidence also supports the ALJ's determination. Consultative examiner Dr. Damari found in January 2015 that Bonilla Mojica's attention, concentration, and recent and remote memory skills were only "[m]ildly impaired." R. 672. Thus, although her cognitive functioning was below average, R. 672, Dr. Damari opined that Bonilla Mojica would be "able to follow and understand simple directions and instructions and perform simple tasks independently." R. 673. Dr. Damari further concluded that although Bonilla Mojica "would be significantly impaired in the ability to maintain a regular schedule," she is only "mildly impaired in the ability to learn new tasks," and she "is able to make appropriate decisions." R. 673. In giving "partial weight" to Dr. Damari's opinions, the ALJ gave "great weight" to the opinion that Bonilla Mojica

> is able to follow and understand simple directions and instructions and perform simple tasks independently with mild impairment in the ability to maintain attention and concentration and ability to learn new tasks. I give great weight to the opinion that she is significantly impaired in the ability to perform complex

tasks independently but that she is able to make appropriate decisions. I also give great weight to the opinion that she is moderately impaired in the ability to relate adequately with others and significantly impaired in the ability to appropriately deal with stress.

R. 47. As to these particular opinions, the ALJ could properly give them great weight because they are supported by the notes of treating physicians Drs. Jackson and Mejia, as already detailed, and by the record as a whole. As to Dr. Damari's opinion that Bonilla Mojica "would be significantly impaired in the ability to maintain a regular schedule," the ALJ found this opinion to be "less persuasive" because Dr. Damari did "not explain why [Bonilla Mojica] would be significantly impaired in the ability to maintain a regular schedule and there is no evidence to support this conclusion in the record." R. 47. Additionally, the ALJ correctly determined that there was "no evidence [that] the claimant's psychiatric problems would 'significantly interfere' with her ability to function on a daily basis and Dr. Damari provides no reason for this and he did not define what he meant by 'significantly interfere.'" R. 47. Thus, the ALJ could permissibly discount these opinions of Dr. Damari. See, e.g., Heitz v. Comm'r of Soc. Sec., 201 F. Supp. 3d 413, 422 (S.D.N.Y. 2016) ("as part of his review of the evidence before him, an ALJ has the discretion to grant various degrees of weight to the opinion of [consultative] practitioners") (citing Diaz v. Shalala, 59 F.3d 307, 313 n.5 (2d Cir. 1995)). And to the extent that Dr. Damari's opinion as to the inability to maintain a regular schedule is supported at all, it is still within the ALJ's discretion to resolve "[g]enuine conflicts in the medical evidence." Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002) (citation omitted); accord Camara v. Colvin, 2013 WL 5870059, at *5 (S.D.N.Y. Oct. 23, 2013).

We note that while Bonilla Mojica continued to report feelings of frustration, irritable mood, and anger into 2015, see, e.g., R. 59, and at times reported hallucinations and hearing voices, see R. 148, 476, 611, that does not change the fact that substantial evidence exists to

support the ALJ's RFC determination as discussed above.  See Genier, 606 F.3d at 49 ("Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings must be given conclusive effect so long as they are supported by substantial evidence."); Johnson, 563 F. Supp. 2d at 454 ("[i]f the reviewing court finds substantial evidence to support the Commissioner's final decision, that decision must be upheld, even if substantial evidence supporting the claimant's position also exists").  Moreover, Bonilla Mojica also denied auditory and visual hallucinations on multiple occasions.  R. 378, 479, 499, 611, 635.

Notably, the ALJ explicitly stated that she "limited" Bonilla Mojica to light work with certain limitations to account for her impairments.  The ALJ "limited her to light work with postural limitations to account for any pain from her mild lumbar degenerative disc disease." R. 38.  In making her RFC determination, the ALJ also

> included several severe mental impairments and limited [Bonilla Mojica] to simple and routine tasks in a low stress job with only occasional changes in the work setting, only occasional decision making required, and no production-pace work, such as assembly line work, to account for her symptoms of anxiety, depression, PTSD, and occasional hallucinations.

R. 43.  The ALJ also limited Bonilla Mojica "to occasional brief and superficial interaction with supervisors, co-workers and the general public but no face to face interaction with the general public and no team-based activities to account for her reports of problems interacting with others including irritability, anger, and avoidance."  R. 43.  Thus, it is apparent that the ALJ considered the entire record in making her RFC determination, which ultimately accounted for Bonilla Mojica's impairments.  See R. 36.  Accordingly, the ALJ did not err in making her RFC determination.

D.  Step Five Determination

As the Second Circuit has noted, "[a]t Step Five [in the disability evaluation process], the Commissioner must determine that significant numbers of jobs exist in the national economy that the claimant can perform," and an "ALJ may make this determination either by applying the Medical Vocational Guidelines or by adducing testimony of a vocational expert." McIntyre v. Colvin, 758 F.3d 146, 151 (2d Cir. 2014). An ALJ may rely on a vocational expert's testimony presented in response to a hypothetical if there is "substantial record evidence to support the assumption[s] upon which the vocational expert based his opinion." Dumas v. Schweiker, 712 F.2d 1545, 1554 (2d Cir. 1983).

Here, the ALJ properly determined that "[c]onsidering [Bonilla Mojica's] age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that [Bonilla Mojica] can perform." R. 50. The VE testified that unskilled occupations requiring light work exist that a person with Bonilla Mojica's limitations would be capable of performing. R. 133-35. The VE used the Department of Labor's Dictionary of Occupational Titles to opine that Bonilla Mojica could perform work as a cleaner or mail clerk, jobs that exist in significant numbers in the national economy. R. 50. The ALJ could properly rely on the VE's testimony regarding this issue. See Dumas, 712 F.2d at 1553-54 (vocational expert's testimony on the availability of such sedentary jobs provided substantial evidence for the ALJ's finding on this issue). In sum, there is substantial evidence to support the ALJ's finding that there existed substantial gainful employment that Bonilla Mojica would be capable of performing.

E.  Adequacy of the Administrative Record

When an ALJ assesses a claimant's alleged disability, an ALJ must develop the

claimant's medical history "for at least the 12 months preceding the month in which" the claimant filed his application. 20 C.F.R. §§ 404.1512(b)(1), 416.912(b)(1). The governing statute provides that the ALJ "shall make every reasonable effort to obtain from the individual's treating physician (or other treating health care provider) all medical evidence, including diagnostic tests, necessary in order to properly make" the disability determination. 42 U.S.C. § 423(d)(5)(B); accord 20 C.F.R. §§ 404.1512(b), 416.912(b). "Nevertheless, the Second Circuit has held that it is not per se error for an ALJ to make a disability determination without having sought the opinion of the claimant's treating physician." Sanchez v. Colvin, 2015 WL 736102, at *5 (S.D.N.Y. Feb. 20, 2015) (citing Tankisi v. Comm'r of Soc. Sec., 521 F. App'x 29, 33-34 (2d Cir. 2013) (summary order), and Pellam v. Astrue, 508 F. App'x 87, 90 (2d Cir. 2013) (summary order)). This is particularly true where "the ALJ . . . had all of the treatment notes from [the claimant's] treating physicians," Pellam, 508 F. App'x at 90, and where the rest of the record, "contains sufficient evidence from which an ALJ can assess the petitioner's [RFC]," Tankisi, 521 F. App'x at 34. By contrast, where the medical record is not voluminous and contains no assessment of the claimant's limitations from a treating physician, further development may be required. Cf. id. ("Given the . . . voluminous medical record assembled by the claimant's counsel that was adequate to permit an informed finding by the ALJ, we hold that it would be inappropriate to remand solely on the ground that the ALJ failed to request medical opinions in assessing residual functional capacity.") (citations omitted).

Where the ALJ fails to develop the record, remand is appropriate. Rosa v. Callahan, 168 F.3d 72, 82-83 (2d Cir. 1999); accord Cancel v. Colvin, 2015 WL 865479, at *5 (S.D.N.Y. Mar. 2, 2015) (citing cases).

The ALJ's duty to develop the record remains the same regardless of whether the

claimant is represented by counsel. Tejada v. Apfel, 167 F.3d 770, 774 (2d Cir. 1999) (citing

Pratts v. Chater, 94 F.3d 34, 37 (2d Cir. 1996)). Furthermore, the obligation to develop the

record is "enhanced when the disability in question is a psychiatric impairment." Lacava v.

Astrue, 2012 WL 6621731, at *11 (S.D.N.Y. Nov. 27, 2012), adopted, 2012 WL 6621722

(S.D.N.Y. Dec. 19, 2012); accord Martinez v. Comm'r of Soc. Sec., 2019 WL 1236324, at *4

(S.D.N.Y. Mar. 18, 2019); Gabrielsen v. Colvin, 2015 WL 4597548, at *4 (S.D.N.Y. July 30,

2015) (citing cases). This "heightened duty" derives from the fact that a claimant's mental

illness may greatly impede an evaluator's assessment of a claimant's ability to function in the

workplace, thus necessitating a more thorough review. See Gabrielsen, 2015 WL 4597548, at *3

(noting that an individual with a mental disorder often adopts "a highly restricted and/or

inflexible lifestyle within which they appear to function wel[l]") (citation and internal quotation

marks omitted); accord SSR 85-15, 1985 WL 56857, at *6 (1985) (same).

Here, the ALJ adequately developed the record. To start, the ALJ adjourned the first

administrative hearing in order to, inter alia, obtain more recent records of Bonilla Mojica's

psychiatric treatment records from Dr. Jackson and her therapist Christina Toro. R. 90-92. The

ALJ received hospital records from St. Barnabas, see R. 677-94, but noted in her decision that

the records did not contain notes from the therapist Christina Toro, R. 44.[5] In any case, there

were additional records that the ALJ never received and that were later submitted by Bonilla

Mojica (through counsel) to the Appeals Council. See 1-2, 56-74; see also Perez v. Chater, 77

F.3d 41, 45 (2d Cir. 1996) (holding that "new evidence submitted to the Appeals Council

---

[5] We question the ALJ's statement that "there are no notes from Mr. [sic] Toro in the
record." R. 44. In fact, the records that the ALJ obtained contained notes from St. Barnabas,
which were co-authored and co-signed by Toro. See R. 677-79, 680-82 (notes from June and
September 2016). However, the ALJ is correct as to the absence of notes authored solely by
Toro after any psychiatric examination.

following the ALJ's decision becomes part of the administrative record for judicial review when the Appeals Council denies review of the ALJ's decision" as long as "the evidence [is] new and material and that it . . . relate[s] to the period on or before the ALJ's decision"); Apr. 2 Comm'r Letter at 3 (conceding that the records submitted to the Appeals Council were new and related to the relevant period, but arguing that they were not material "because there was no reasonable possibility that they would have influenced the ALJ to decide Plaintiff's case differently").

Thus, it is true that the ALJ did not consider the records submitted to the Appeals Council. Furthermore, in her decision, the ALJ noted more than once that there were gaps in Bonilla Mojica's medical and treatment history, including from late-2014 to mid-2016, the date range encompassing the records submitted to the Appeals Council. See R. 40, 41, 42. Despite this, there is no indication that the ALJ failed to "make every reasonable effort to obtain from the individual's treating physician (or other treating health care provider) all medical evidence, including diagnostic tests, necessary in order to properly make" a disability determination. 42 U.S.C. § 423(d)(5)(B). Indeed, the ALJ adjourned the first hearing in order to ensure she had the most recent records for the purpose of asking relevant questions to Bonilla Mojica at the hearing, see R. 90, and for the ALJ to make her ultimate disability determination.

But even if the ALJ did err in failing to develop the record as to additional notes from Toro, our review of the entire record, including the records submitted to the Appeals Council that were not considered by the ALJ, make it clear that the ALJ's decision was supported by substantial evidence. See Perez, 77 F.3d at 46 ("When the Appeals Council denies review after considering new evidence, we simply review the entire administrative record, which includes the new evidence, and determine, as in every case, whether there is substantial evidence to support the decision of the Secretary."). This is because the records submitted to the Appeals Council do

not indicate any worsening of Bonilla Mojica's symptoms or impairments, and indeed show that she was in a stable condition. For instance, a treatment summary from January 28, 2015, signed by Toro noted that Bonilla Mojica was "cooperative and stable on medication." R. 56. "[Bonilla Mojica] reported wanting to work on . . . goals and objectives." R. 56. In another report signed by Toro, Bonilla Mojica was found to be stable on medication again in late April/early May 2015. R. 60. In September 2015, she was noted as being "able to use . . . coping skills" and could "verbalize her trauma, symptoms, [and] triggers." R. 68. The findings in these notes are supported by St. Barnabas notes that were already in the record and which the ALJ reviewed and extensively referenced in making her disability determination. See, e.g., R. 35 (citing, inter alia, R. 683) (noting that Bonilla Mojica was "able to control her temper better on medications"), 42 (citing R. 680, 689-94) (noting that "[i]n the past, [Bonilla Mojica] found medications and therapy sessions helpful" and that she "was able to recognize triggers and [was] re-educating herself with positive coping skills that were re-enforced by her therapist").

Furthermore, the new records submitted to the Appeals Council do not detract from the fact that the overall record contains substantial evidence of sustained gaps in treatment. For instance, Bonilla Mojica at one point went approximately 10 months in between sessions with her therapist, R. 87, and Bonilla Mojica testified that she stopped attending therapy when she "went back with [her] son's father" because she "thought . . . everything [was] going to be fine," R. 120. Bonilla Mojica also stated that it was not until May 2016 that she resumed psychiatric treatment at St. Barnabas, R. 121-22, and had reported to Dr. Jackson in September 2016 that she had gone more than a year before obtaining a new prescription for her psychiatric medication, R. 683. In other words, this is not a case where "the new evidence before the Appeals Council contradicted the ALJ's determination" that Bonilla Mojica could perform light work with certain

restrictions and was therefore not disabled under the Act.  Kelly v. Colvin, 2016 WL 5374113, at

*10 (N.D.N.Y. Sept. 26, 2016).  Instead, "the record, which included extensive treatment notes,

opinions from other treating sources, and consultative examination reports was adequate to

determine whether or not plaintiff was disabled."  Riker v. Comm'r of Soc. Sec., 2018 WL

2464446, at *8 (N.D.N.Y. June 1, 2018) (citing Perez, 77 F.3d at 47).

Also, we note that while Toro is referred to as Bonilla Mojica's "therapist," see, e.g., R.

44, 87, 678, Toro is identified in the record as a "LMSW," or "licensed master social worker,"

see, e.g., R. 678.  Although "the opinions of a licensed clinical social worker 'may provide

highly relevant evidence bearing upon the severity of an individual's impairments and how it

may affect an individual's ability to function,'" Dowd v. Comm'r of Soc. Sec., 2013 WL

3475479, at *4 (W.D.N.Y. July 10, 2013) (quoting Davis ex rel. Maitland v. Colvin, 2013 WL

1183000 at *9 (N.D.N.Y. Feb. 27, 2013)), "social workers do not qualify as 'acceptable medical

source[s],'" Bliss v. Comm'r of Soc. Sec., 406 F. App'x 541, 541 (2d Cir. 2011) (quoting 20

C.F.R. §§ 404.1513(a), 404.1527(a)(2)); accord Berry v. Comm'r of Soc. Sec., 2015 WL

4557374, at *14 (S.D.N.Y. July 29, 2015).  Thus, any opinions or assessments of a social worker

such as Dr. Toro would be "ineligible to receive controlling weight."  Bliss, 406 F. App'x at 541.

In any event, the records Bonilla Mojica submitted to the Appeals Council that are now part of

the administrative record do not contain any opinions provided by Toro.  And, as stated above,

rather than demonstrating "the severity of [Bonilla Mojica]'s impairments and . . . [her] ability to

function," Dowd, 2013 WL 3475479, at *4, the records actually show that Bonilla Mojica was

coping and was stable on medication.  See also Hanchett v. Colvin, 198 F. Supp. 3d 252, 262-63

(W.D.N.Y. 2016) ("Although the ALJ did not assign any specific weight to the 'other source'

opinion of [the LMSW], any error . . . is harmless because the Court is able to glean the ALJ's

reasoning with regard to [the LMSW]'s opinion . . . .").

Finally, we note that the record in this case contains medical records and opinions from Bonilla Mojica's treating sources, in addition to evaluations made by consultative examiners and state agency evaluators. See Section III.C.2 above (discussing the ALJ's mental RFC determination). Thus, this case is not one where the "record is not voluminous and there is little information as to what treating sources thought about the claimant's limitation." Luciano v. Comm'r of Soc. Sec., 2017 WL 4326078, at *7 (S.D.N.Y. Sept. 28, 2017) (citing cases). This case does not present a "close question," id., as to the need to remand to request further statements from treating sources.

IV. CONCLUSION

For the foregoing reasons, the Commissioner's motion for judgment on the pleadings (Docket # 15) is granted. The Clerk is requested to enter judgment dismissing the case.

SO ORDERED.

Dated: New York, New York
September 11, 2019

GABRIEL W. GORENSTEIN
United States Magistrate Judge

Copy to:

Veronica M. Bonilla Mojica
2588 Creston Avenue, #2
Bronx, New York 10468

36